# 24-1185-cv

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT



DIEGO HEREDIA,

*Plaintiff-Appellant,*

*v.*

CITY OF NEW YORK, NEW YORK CITY POLICE DEPARTMENT,
DET. THOMAS DONEGAN, DET. THOMAS COZART,

*Defendants-Appellees,*

A.D.A. ZACHARY WEINTRAUB, P.O. BRIAN WILSON, JOHN DOES 1 - 20,
NAMES BEING FICTITIOUS, AS ACTUAL NAMES UNKNOWN,

*Defendants.*

—————————————

*On Appeal from the United States District Court
for the Eastern District of New York*

## BRIEF AND SPECIAL APPENDIX FOR PLAINTIFF-APPELLANT

JOSEPH W. MURRAY, ESQ.
185 Great Neck Road, Suite 461
Great Neck, New York 11021
646-838-1702

*and*

LAW OFFICES OF
 NORA CONSTANCE MARINO
175 East Shore Road, Suite 230
Great Neck, New York 11023
516-829-8399

*Attorneys for Plaintiff-Appellant*

 (212) 719-0990
appeals@phpny.com

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................. iii

I.      SUBJECT MATTER JURISDICTION AND APPELLATE
        JURISDICTION ..............................................................................1

II.     BASIS FOR THE COURT OF APPEALS' JURISDICTION .......................1

III.    FILING DATES ..............................................................................1

IV.     ASSERTION ..................................................................................1

V.      A STATEMENT OF THE ISSUES PRESENTED ................................1

VI.     NATURE OF CASE AND RELEVANT PROCEDURAL
        HISTORY ......................................................................................2

VII.    JUDGE WHO RENDERED THE DECISION AND THE
        DISPOSITION................................................................................3

VIII.   SUMMARY OF ARGUMENT .......................................................3

        A.   Parker ID evidence...............................................................7

        B.   Atkinson ID evidence ...........................................................9

        C.   Acosta ID evidence ..............................................................9

        D.   Jiminez ID evidence............................................................10

        E.   There was no credible ID, and thus, no probable cause .........11

        F.   Material misrepresentations to the DA .................................12

IX.     FACTS .......................................................................................14

X.  ARGUMENT ..................................................................................17

A.  There was no probable cause for an arrest .............................17

B.  The Dufort case and the subject case ....................................19

C.  Donegan's inadequate investigation ......................................31

D.  Malicious prosecution ...........................................................32

E.  Qualified Immunity ...............................................................34

F.  Cozart ....................................................................................35

XI. CONCLUSION ...............................................................................36

CERTIFICATE OF COMPLIANCE .......................................................37

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bail v. Ramirez,*
No. 04 Civ. 5084(WHP), 2007 WL 959045
(S.D.N.Y. Mar.29, 2007) .....................................................30

*Beyer v. Cty. of Nassau,*
524 F.3d 160 (2d Cir. 2008) ...............................................27

*Celestin v. City of New York*,
581 F. Supp. 2d 420 ...........................................................30

*Dufort v. City of New York*,
874 F.3d 388 (2d Cir. 2017) .......................................*passim*

*In re London Silver Fixing, Ltd., Antitrust Litig.*,
213 F. Supp. 3d 530 (S.D.N.Y. 2016) ...............................22

*Jenkins v. City of New York*,
478 F.3d 76 (2d Cir. 2007) .................................................20

*Krause v. Bennett*,
887 F.2d 362 ......................................................................29

*Miloslavsky v. AES Engineering Soc., Inc.*,
808 F.Supp. 351 (S.D.N.Y.1992),
*aff'd,* 993 F.2d 1534 (2d Cir.1993) ...................................30

*Mitchell v. City of NY,*
841 F.3d 72 .......................................................................34

*People v. Roldan,*
211 A.D.2d 366, 627 N.Y.S.2d 1014 (1995),
*aff'd,* 88 N.Y.2d 826, 666 N.E.2d 553 (1996) ...................23

*Stansbury v. Wertman*,
721 F.3d 84 ........................................................................20

*Veltre v. Rainbow Convenience Store, Inc.*,
172 A.D.3d 621, 101 N.Y.S.3d 37 (2019) .........................................................22

**Statutes**

28 USC § 1331 ...........................................................................................1

42 USC § 1983 ...........................................................................................1

**Rules**

FRAP 3 .....................................................................................................1

FRAP 4 .....................................................................................................1

**Other Authorities**

Cornell Law School,
https://www.law.cornell.edu/wex/circumstantial_evidence ..............................22

## I.    Subject matter jurisdiction and appellate jurisdiction

This court has jurisdiction to adjudicate the instant action pursuant to 28 USC Sec. 1331, and 42 USC 1983.  Plaintiff herein alleges constitutional law violations.

## II.    Basis for the court of appeals' jurisdiction

Plaintiff appeals as of right pursuant to FRAP 3 and 4.  Plaintiff timely filed a notice of appeal and has complied with all additional rules pursuant to this Court's rules.

## III.   Filing dates

The date of entry of judgment with respect to the lower court decision on appeal herein was March 30, 2024.  A notice of appeal was filed April 26, 2024.

## IV.    Assertion

This appeal is from a final decision and judgment that disposes of plaintiff's claims herein, by granting summary judgment on behalf of defendants.

## V.    A statement of the issues presented

This matter involves a case sounding in false arrest and malicious prosecution. The issue presented herein is whether or not there was probable cause to arrest the plaintiff following an alleged burglary at his former place of employment.  The defendants claimed there was probable cause based on three identifications from plaintiff's former co-workers; the lower court assumed that

1

fact to be true, and deemed there was probable cause, and granted summary judgment in favor of defendant. There were not in fact three identifications; there was only one, and that identification was not credible or reliable, as it was based on a video that only depicted an unidentifiable human figure clothed from head to toe in dark clothing with no facial or other identifiable features visible, and as such, a reasonable officer would not have relied on it. Thus, whether or not there was probable cause was not a question that should have been decided on summary judgment, but rather, should have been decided by a jury.

Since there were questions of fact, summary judgment was not warranted or appropriate.

## VI.   Nature of case and relevant procedural history

The nature of the case is false arrest and malicious prosecution. The procedural history is as follows.

Plaintiff filed a summons and verified complaint in Supreme Court Queens County on July 8, 2019. Defendants filed a notice of removal to federal court on September 13, 2019. The defendants herein answered on February 21, 2020. Discovery commenced and was completed. Defendants moved for summary judgment on June 14, 2023. Plaintiff opposed defendant's motion on July 10, 2023. Defendant submitted a reply on July 17, 2023. The lower court issued on

March 29, 2024, granting defendant's summary judgment and dismissing plaintiff's case. Plaintiff filed a notice of appeal on April 26, 2024.

## VII. Judge who rendered the decision and the disposition

The judge who rendered the decision being appealed is Judge LaShann DeArcy Hall, who dismissed plaintiff's case by granting summary judgment in favor of defendants, claiming that there was probable cause to arrest the plaintiff.

## VIII. Summary of Argument

This appeal is filed and submitted in support of plaintiff-appellant Diego Heredia's (hereinafter, "plaintiff" or "Heredia") appeal regarding a decision to dismiss plaintiff's case on summary judgment. Plaintiff appeals due to the lower court's error in relying on facts that are clearly in disputed, and others that have been outright refuted, warranting a reversal of the lower court decision.

This case involves false arrest and malicious prosecution. Defendants, the City of New York and its police department, and two individual detectives who were acting within the scope of their employment when they falsely arrested the plaintiff without probable cause (Donegan and Cozart), moved for summary judgment claiming that they had probable cause to arrest the plaintiff. Plaintiff claimed they did not have reliable probable cause and/or that whether or not there was reliable probable cause was a question for the jury.

The following facts in this paragraph are undisputed. Plaintiff was arrested by Detective Cozart on February 2, 2017 for a burglary that allegedly occurred at his former place of employment, which was an art gallery located on Tenth Street in New York City. Plaintiff had not worked at that gallery for nine months, as he had left their employ the prior April, in 2016. Defendant-appellees City of New York and New York City Police Department ("NYPD"), by way of Detective Donegan, allegedly investigated the incident. In the course of said investigation, defendant-appellees (hereinafter, "defendants") obtained outdoor surveillance video that belonged to the gallery's next door neighbor, New York University ("NYU), that depicted a human figure walking on a sidewalk and entering the gallery the night of the burglary.

The figure was clothed head to toe in dark bulky clothing. A[1]283, 286. The person's face and head were completely covered. A283, 286. One could not see the person's face, head, or hair (or lack thereof) at all. A283, 286. There was nothing distinctive about the clothing whatsoever - it was a common black jacket, common black pants, and common black sneakers. A283, 286.

---

[1] Appendix on appeal is noted as "A"

Screenshots of the subject video follow, and are within the record[2] at A283, 286. The entire video is located as a placeholder at A 218, and a separate copy of the video has been provided to the Court.

 

 

 

---

[2] The appendix may also referred to at the "record".

It is objectively impossible for anyone to make a positive identification from the covered figure depicted in this video.

Donegan showed this video to three gallery employees, Edwin Jiminez, John Acosta, and William Atkinson. There was a fourth employee, David Parker, who Donegan spoke with, but according to Donegan's deposition testimony and other evidence, Parker did not view the video during the investigation, since "Atkinson had more of a daily interaction… so he [Atkinson] would look at the video". A159-164. See, also, DD5s[3], none of which refer to the video being viewed by Parker, A19-22.

Jiminez said that he could identify the figure in the video as being plaintiff based on the jacket the figure was wearing, the sneakers the figure was wearing, and the "mannerisms", specifically, the way the figure "walked". Atkinson stated that he could not identify the figure. Acosta stated that he could not identify the figure, but that he had seen plaintiff wear a jacket and shoes like that before. These are undisputed facts contained in the record, based on the deposition testimony of Detective Donegan R-A159-164, and his DD5s, A19-22

---

[3] A DD5 is an internal New York City Police Department document that documents what takes place during an investigation, such as a witness interview, which is created by the officer or detective contemporaneously with the event. All DD5s in connection with this investigation and the discovery obtained herein are located at A19-22.

Despite these undisputed facts, the defendants argued that plaintiff was identified by three individuals. In some instances, defendant stated that there were two identifications. Either way, this claim is flatly contradicted by the testimony of Donegan and his DD5s, which he created. Only Jiminez made any claim of an identification (also referred to herein as an "ID"); Atkinson was unable to make an ID, and Acosta was unable to make an ID, merely stating that he had seen the plaintiff wear similar clothes as the figure. Note, neither Jiminez nor Acosta stated that plaintiff wore "similar clothes" on the night of the burglary – they merely stated that plaintiff wore similar clothes at some random unidentified point in time, that could be no sooner than nine months prior to the alleged burglary, and go back as far as several years.

## A.    Parker ID evidence

Parker did not view the video at all during the investigation (according to Donegan's deposition testimony) [4]. Parker did, however, view the video a year and a half later in July of 2018, during Heredia's criminal trial (according to the trial transcript from Heredia's criminal trial).  During that trial, Parker testified that he

_____

[4] There is also no DD5 that refers to Parker viewing the video. There are DD5s that refer to the other witnesses being interviewed or viewing the video. A19-22.  The absence of a DD5 referring to Parker viewing the video is additional evidence that Parker did not view the video during the investigation.

did in fact view the video during Donegan's investigation a year and a half earlier. A244. This was in complete contradiction to Donegan's EBT testimony and DD5s.

That said, at the criminal trial, Parker did not testify that he actually had identified plaintiff to Donegan a year and a half earlier during that investigation. He merely stated that he viewed the video prior thereto, but he was silent as to whether or not he actually made an actual identification resulting from that alleged prior viewing, which allegedly took place during the investigation. When he was *shown* the video *at the criminal trial*, a year and a half later, he identified the figure depicted therein as being the plaintiff in the courtroom, but that was a year and a half after the incident. There was no testimony that Parker identified the plaintiff at any time prior to plaintiff's arrest. A244. The exact testimony is at A 248-249:

> *Q. [Prosecutor]: At this time, I'm going to paly for this witness what's in evidence as People's 2 [the NYU video].... I'm stopping the clip at 11:57:38. What did you observe in the top right corner?*
> *A.     A figure emerged....*
> *Q.     I'm going to continue playing.... I'm going to pause at 11:58. Do you recognize that figure?*
> *A.     Yes.*
> *Q.     Would you tell the jury who you recognize that figure to be?*
> *A.     I see that as being Diego Heredia.*

This testimony, taken a year and a half after plaintiff's arrest, is meaningless. Probable cause must exist before an arrest, not a year and a half later. There is no testimony in the record that Parker ever identified the plaintiff to the police prior to the arrest.

8

Moreover, Donegan testified to at his deposition that Parker never viewed the video during the investigation (A163-164):

> A.    I called Mr. Parker who came to the precinct with Mr. Atkinson. It was decided that Mr. Atkinson had a more of a daily interaction with the employees, so he would look at the video.

There is also no DD5 memorializing Parker viewing the video. A19-22. There is no evidence, from anyone or in any form, that he ever did.

Thus, while it is disputed as to whether or not Parker actually viewed the video during the investigation, the claim that Parker ever ID'd plaintiff prior to plaintiff's arrest is utterly refuted by the record.

Thus, Parker did not ID the plaintiff.

**B.    Atkinson ID evidence**

Atkinson could not ID the figure in the video at all.  See, A164, Donegan testimony, "Atkinson didn't recognize anyone." See, also, A19, DD5.

Thus, Atkinson did not ID the plaintiff.

**C.    Acosta ID evidence**

Donegan stated that Acosta did not recognize the person in the video.  See Donegan deposition testimony, A160:

> Q. Do you recall if Mr. Acosta recognized the person on the video?
> A: He did not.

Then later, Donegan testified, "I believe Acosta said that he saw the same jacket and sneakers. He said that he saw Diego wear the same jacket and sneakers

9

when I showed him the video", A163. See also DD5, A20, Acosta "didn't recognize the person in the video but said he had seen former employee of gallery Diego wear the same jacket and sneakers."[5]

Thus, Acosta did not ID the plaintiff.

### D.    Jiminez ID evidence

Only Jiminez claimed to bee able to make some sort of "identification", but this ID was highly suspect and objectively not reliable or credible for the purposes of establishing probable cause, since there was no way to see any actual identifying features of the figure in the video.

With respect to Jiminez, Donegan testified as follows, A160-161:

> Q.    *Do you recall what [Jiminez] indicated after he viewed the video?*
> A.    *That the person in the video was Diego [Heredia].*
> Q.    *And how did he identify him?*
> A.    *He said that he worked with him for three or four years. He saw Diego wear the same clothing in the video and had the same mannerisms as Diego.*
> Q.    *What mannerisms was he referring to?*
> A.    *His walk.*
> Q.    *So he had the same gait as Diego?*
> A.    *I don't know.*

While Jiminez said the word, "the person in the video was Diego", based on what he said after that, it is clear that he did not really ID Heredia, as he only recognized that Heredia had worn "the same clothing" as the figure in the video,

---

[5] Note, there were numerous typographical errors in this DD5, that were not repeated herein.

and had the same "walk", which was not even explained or explored by Donegan. There appears to be no limp, no bounce, no bop, and nothing distinctive about the way the figure in the video "walks".

The clothing referred to was nondistinctive, common black clothing, with no identifying features or colors.  Moreover, Jimenez did not testify  that he saw Heredia wearing the similar clothing on the night of the burglary – rather, he said that he saw Diego wear similar clothing when they worked together, which was at least nine months earlier, up to three to four years earlier, when Heredia and Jiminez actually worked together.

No ID was made with respect to Heredia's facial features, or other credible identifying features.

Thus, even though Jiminez said, "the person in the video is Heredia", nothing supports this statement and Jiminez offered no objectively credible information and to support this statement. Jiminez does not offer a sufficient or credible explanation as to how he can positively "ID" a figure in a video whose face and body is completely covered.

### E.    There was no credible ID, and thus, no probable cause

The lower court deemed that probable cause existed because there were "three IDs".  This is utterly incorrect and flies in the face of the evidence. There was one alleged ID (Jiminez), and this one ID was not credible because it was

11

based on an illegible unreliable video, and based on alleged similar generic, non-distinctive clothing that was not even witnessed being worn on the date of the burglary.

With respect to the video, even if there were ten IDs based on the NYU video, plaintiff submits, no one could make a credible ID based on the dark video that merely showed a human figure clothed head to toe in dark bulky clothing, clothing which had no distinguishing or distinctive features. Based on the video, it was impossible to decipher any facial features, height, weight, ethnicity, skin tone, hair type (color, length, baldness), or any distinguishing feature whatsoever. Even gender could be questionable. The video was so unclear and unreliable, that no reasonable officer would have relied on an ID made from the video. None of the clothes were distinctive, but rather, were ordinary and common, with no colors.  As argued before the lower court, this inadequate identification did not equate to probable cause, or even arguable probable cause. Moreover, the defendants herein further failed to expand their investigation, although there were tools readily available to do so. Many other investigatory stones remained unturned, and material misrepresentations were made to the District Attorney ("DA").

## F.    Material misrepresentations to the DA

The felony complaint drafted by the DA's office, based on information provided by Donegan, contains numerous material misrepresentations. For

example, the felony complaint, drafted by the DA's office, "mistakenly noted plaintiff's termination date from the gallery as September instead of April 2016", and that it also "mistakenly stated that three individuals identified plaintiff in the NYU video, instead of clarifying that two individuals identified plaintiff and a third only recognized his clothing.[6]" Def. Memo of Law p. 4, A263. Defendant refers to these mistakes as "minor errors". *Id.* Being that defendant's entire case rested on the alleged ID of plaintiff, to refer to "mistakes" regarding said ID as "minor" is absurd. The ID is the very heart of the matter. Moreover, there were not three, or even two IDs – there was just one, just Jiminez, and that ID was based only on a type of shoes and a type of jacket Jiminez claims to have seen plaintiff wear nine months to several years earlier, and "mannerisms", which Donegan never even explored or were defined. His DD5 is silent as what "mannerisms" even meant. See A19-23 DD5s), A286-287 (plaintiff opposition); A263-264 (defendant memo of law); A197 (felony complaint); A200 (Donegan sworn affidavit).

It can be assumed that these material misrepresentations were also provided to the grand jury.

---

[6] Only one person – Jimenez – claimed to recognize the clothing of the individual in the video as being similar to items previously worn by plaintiff. It is incorrect to state that "two" individuals identified the plaintiff.

This is a case where the determination of whether or not probable cause existed should have been decided by a jury, summary judgment should have been denied, and reversal is warranted.

## IX.    Facts

The facts that were before the lower court, taken from plaintiff's brief in opposition, can be found at A280-284.

Plaintiff's rebuttal to defendant's preliminary statement and statement of facts that were before the lower court, taken from plaintiff's brief in opposition can be found at A284-288.

## X.    Argument

As the lower court corrected states, "the Court is to believe the evidence of the non movant and draw all justifiable inferences in his favor."  A315-316. It is respectfully submitted, in this case, the lower court did not do so. Rather, the lower court relied on wholly disputed facts, in favor of the movant.  This is reversible error.

The lower court's version of "undisputed facts" is in error.  The lower court sets forth facts that were disputed and even refuted – facts that go to the very heart of the matter.

First, the lower court completely ignored the fact that the officers involved relied on a video that was objectively illegible, in that the figure depicted in this

video was completely clothed in heavy, bulky, winter clothing, his head was covered, his face was covered, his hair was covered. There was simply no way to determine any meaningful identifiable characteristic of the person depicted in the video whatsoever, making the video an unreliable source to rely on for an identification. Yet, the lower court ignored this completely.

The lower court did not even state in its opinion whether or not it reviewed the video itself. The video was the key, the focal point, to the alleged identification – yet the lower court was silent with respect to this critical aspect of this case. Due to the overwhelming low quality of the video, any identification resulting from viewing this video should have been suspect, questioned, if not completely rejected. It certainly did not constitute a basis to establish probable cause for an arrest.

Secondly, and critically, the lower incorrectly states that three individuals identified the plaintiff from this video, and this statement is simply untrue. Only Jiminez claimed to be able to identify the figure in the video as being the plaintiff.

The lower court stated that when plaintiff was arrested, he was transported to the precinct, "wearing black Puma sneakers with a white stripe", and "because plaintiff's sneakers appeared to match those worn by the perpetrator on the

surveillance footage, they were vouched as evidence", and cites to defendant's 56.1 reply, ECF No. 75, para. 65. A314[7].

This fact was agreed to, but only with respect to the police officers vouchering the sneakers because they thought the sneakers appeared to match those worn by the perpetrator in the video. That was the statement at para. 65, and that was what was agreed to. However, the figure in the video was not wearing black sneakers with a white stripe –rather, the figure in the video was wearing all black sneakers, with a white sole. The difference between a white stripe and a white sole on a shoe is a significant one, that was discussed in plaintiff's opposition, as almost all sneakers have white soles.  See A284-286.

Moreover, there was no testimony from anyone that they witnessed plaintiff wearing the same or similar clothes on the date of the burglary.  To claim an individual was seen wearing the same or similar clothing, at some random, unidentified point in time, and not on the date of the alleged crime, can certainly not be construed to be a reliable identification of any sort.

The "disputed" facts here are not even disputed, pursuant to the deposition testimony of Donegan, the trial testimony of Parker, as well as the DD5s, all of which collectively set forth the following, undisputed facts: that Atkinson was

---

[7] The shoes worn by the figure in the video do not have a white Puma Brand stripe on them. They are solid black; nor did Jiminez or any witness ever even mention the "Puma" brand.

unable to make an ID; that Acosta was unable to make an ID, but did see plaintiff wear that type of coat and sneakers; that Jiminez "has seen Diego wear the same clothes in the video" and that "the subject has the same mannerisms of Diego", and that Parker did not view the video and identify the plaintiff prior to plaintiff's arrest.

**A.     There was no probable cause for an arrest**

The lower court did not view the evidence in a light most favorable to the non movant and viewed disputed and refuted facts as undisputed facts, warranting reversal.

The lower court correctly notes that "an officer has probable cause when he or she has 'reasonably trustworthy information as to [] facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been…. committed by the person to be arrested.'" A316. The issue herein, however, is that the subject officers did not have "reasonably trustworthy information". The officers had one ID, based solely on common non-distinctive clothing and a "walk", and not even clothing allegedly worn by the plaintiff on the date of the alleged crime, but rather, nine months to several years ago. The "clothing" consisted of a common black bulky winter jacket and common black sneakers with a white sole (like millions of jackets and millions of sneakers).

17

The lower court then incorrectly states that "on the record here, there is sufficient evidence" with respect to probable cause. A316. It then states that "two gallery employees identified plaintiff on surveillance footage as the person seen entering the gallery." A316. The lower court refers to Jiminez, claiming that "he recognized the man depicted as plaintiff based on the clothing and how he walked" (A316), and that "Parker, likewise identified plaintiff as the man in the video" (A316), and that Acosta "confirmed that the clothing the man in the video wore matching clothing that he had seen plaintiff wear while working at the gallery" (A317).

First, identifying generic, non-descriptive, nondistinctive clothing that someone wore "while working at a" job, for some random unidentified point in time that occurred between nine months to several years earlier, is not identifying clothing worn by someone committing a crime.

Moreover, as discussed, according to Det. Donegan's testimony, and his DD5s, Parker not only did not identify the plaintiff during Donegan's investigation, he did not even view the video. It was only a year and a half later, at trial, that Parker contradicted what Donegan had testified to at his deposition, and contradicted Donegan's DD5s. While Parker did view the video during the trial, that is irrelevant and meaningless with respect to determining if the officer had probable cause *prior to* the arrest.

While the lower court mentions that plaintiff had keys and the access code to the gallery (A317), it is silent as to how many others had keys and access to that gallery. The record is equally silent – Donegan appeared not to engage in this basic inquiry during his investigation. That said, having keys and access to a facility is not evidence of burglary, and does not create probable cause. The lower court is also silent on the utter illegibility of the surveillance video, and how no portion of the figure's body, face, hair, or proportions, can be deciphered.

### B.      The Dufort case and the subject case

The lower court notes that, "Plaintiff heavily relied on *Dufort v. City of New York, 874 F.3d 388 (2d Cir. 2017)*, but that "Dufort has little value here."  Plaintiff disagrees. Dufort is right on point.

The lower court incorrectly relied solely on the portion of the Dufort decision that discussed a suggestive witness identification involving a lineup. While there was no lineup involved in the subject case, Dufort is still spot on point.

In Dufort, it was concluded that the existence of probable cause is a question of fact for a jury. In Dufort, like here, the question involved one of ID involving clothing. Dufort wrote, "An identification cannot be used to support probable cause if the 'identification procedure was 'so defective that probable cause could not

reasonably be based upon it.' ' *Stansbury v. Wertman*, 721 F.3d 84, 91 n.7 (quoting *Jenkins v. City of New York*, 478 F.3d 76, 93 (2d Cir. 2007))."

Here, the identification procedure was also so defective, that an ID could not be reasonably based on it. First and foremost, the video the "IDers" were asked to view was of poor quality, depicting a fully clothed and covered figure. No facial features were identifiable. No hair color or style was identifiable. No body shape or type was not identifiable. Height was not identifiable. Ethnicity was not identifiable. And, most importantly, the "clothing" that was referred to was extraordinarily common clothing, specifically, an ordinary and extremely common black winter coat with no identifying features, and ordinary and extremely common black sneakers with white soles, also with no identifying features. None of the clothing had specific colors, logos, or designs. Furthermore, there is no evidence from any witness, that they saw plaintiff wearing such clothes on the night of the alleged crime.

These "witnesses", who actually did not "witness" anything, are merely commenting on the generic clothing style they observed the plaintiff wear well into the past.

There is no mention in the lower court decision that the lower court ever actually viewed the video. In fact, the only mention of the quality of the video by the lower court is one mention in a footnote, FN4, A318. There, the lower court

states, "plaintiff argues that Jiminez could not have made a reliable identification because the quality of the video footage was poor. (Pl.'s Opp' at 12.) While plaintiff's contention might undermine Jiminez's credibility as a witness, it does not negate probable cause. Detective Donegan relied on two other witness identifications, as well as circumstantial evidence of plaintiff's access to and familiarity with the gallery and he was not required to evaluate the credibility of the witness' ability to identify plaintiff's features."

This reasoning is completely flawed for several reasons. First, if the credibility of Jiminez's "identification" must be undermined because of the poor quality of the video, then logic dictates that anyone else who engaged in an "identification" based on the same poor quality video also would have their credibility undermined. There was no identification made from any other source than the poor quality video.

Moreover, the lower court is flatly incorrect when it states that "Donegan relied on two other witness identifications" in addition to Jiminez (totaling three IDs). This is false. There were no such other identifications.

Also, the court states that Donegan relied on "circumstantial evidence", that being "plaintiff's access to and familiarity with the gallery." That is not circumstantial evidence. "Circumstantial evidence is indirect evidence that does not, on its face, prove a fact in issue but gives rise to a logical inference that the

fact exists. Circumstantial evidence requires drawing additional reasonable inferences in order to support the claim." See, *Cornell Law School*, https://www.law.cornell.edu/wex/circumstantial_evidence

Here, the lower court is in effect stating that because plaintiff had "access to and familiarity with the gallery," nine months earlier, that that fact can give rise to a logical inference that plaintiff burglarized the gallery. This is an unrealistic leap. An example of actual "circumstantial evidence" would be a long green trench coat being stolen from a store, and one minute later, someone is seen running down the street carrying a long green trench coat. No such circumstantial evidence exists here. Being a former employee of a business that is burglarized is not "circumstantial evidence" of that former employee having engaged in that crime.

See, In re London Silver Fixing, Ltd., Antitrust Litig., 213 F. Supp. 3d 530, 575 (S.D.N.Y. 2016), "The fact that UBS is a market maker and a large bullion bank does not constitute circumstantial evidence of misconduct; such allegations could apply to any number of large banks, none of which is (or could be) named as defendants on that basis."

See, also, Veltre v. Rainbow Convenience Store, Inc., 172 A.D.3d 621, 621, 101 N.Y.S.3d 37, 38 (2019), "The employee's deposition testimony that after he saw plaintiff attempting to walk over a mound of snow, he entered the convenience

store and when he went outside five minutes later he saw plaintiff sitting on the curb, was not circumstantial evidence to raise an issue of fact as to whether plaintiff fell on the sidewalk."

See, also, People v. Roldan, 211 A.D.2d 366, 368–69, 627 N.Y.S.2d 1014, 1015–16 (1995), aff'd, 88 N.Y.2d 826, 666 N.E.2d 553 (1996), "A useful paradigm of circumstantial evidence is the hypothetical prosecution for burglary and larceny set forth in the Criminal Jury Instructions (1 CJI[NY] 9.05). After an example is provided of an eyewitness describing a defendant's flight from a dwelling with a stolen television set (direct evidence), the following is given (at pp 472–473) as an appropriate illustration for the jury of the nature of circumstantial evidence: suppose there is no such direct evidence by an eyewitness. Suppose, instead, that the only evidence at the trial is: (1) Footprints in the snow outside the house which match the defendant's shoes, (2) the presence of defendant's fingerprints on the broken windowpane, and (3) proof that a TV set was missing from the house. These are 'circumstantial facts' which, even if believed by the jury, do not directly establish the defendant's guilt. The jury would be required to take the second step and determine whether the proved 'circumstantial facts' reasonably and logically compel the conclusion that it was the defendant who committed the burglary and larceny, despite the absence of direct evidence from a witness who actually saw him do so."

Here, nothing even close to such evidence even exists. Here, the lower court deemed that just because plaintiff was a former employee, and had "access to and familiarity with the gallery", that that should constitute circumstantial evidence. This is an extremely low bar that cannot be acceptable.

Moreover, there were numerous other employees and former employees of the gallery, who all had the same "access to and familiarity with the gallery" as the plaintiff. See Donegan DD5 at A22, "Parker supplied us [the police] with a list of past employees which were fired or quite recently." There is no evidence that any of them were investigated. Either way, being a "former employee" certainly does not rise to the level of creating "circumstantial evidence."

The facts and evidence show that Donegan relied on one thing, and one thing only – a half-baked "identification" by one person, Jiminez, which only identified clothing and a "walk", or "gait", based on an entirely illegible unclear video of a figure who is covered in common, nondistinctive, bulky clothing from head to toe, without any facial features visible whatsoever, and similar clothing that was allegedly observed being worn by plaintiff nine months to several years earlier – not on the date of the crime.

The lower court further erred in its statement in FN4 (A318) that Donegan "was not required to evaluate the credibility of the witness' ability to identify plaintiff's features." Jiminez never identified plaintiff's "features." The figure in

24

the video's "features" were not visible whatsoever.  Jimnez only identified the common, nondistinctive clothing, and an objectively nondistinctive gait. Thus, it *was* incumbent upon Donegan to "evaluate" the credibility of this witness, or at the very least, to engage in further investigation, before engaging in a premature arrest.

In the <u>Dufort</u> case, an individual named "Park", who was the crime victim, was the IDer against Dufort.  The Court wrote, "Park stated to officers that she did not recognize Dufort's face [in a lineup], and that she could only recognize the color of his sweatshirt as similar to that of one of the assailants… This cannot be construed as an 'identification'' of Dufort for the purposes of probable cause…  At most, Park confirmed a statement she had already given police several times: that Dufort's jacket was similar in color to a jacket or shirt worn by one of the assailants. This statement could be given some weight in a probable cause analysis, albeit limited weight... Its repetition during the lineup, however, given the surrounding circumstances, could provide no evidence that the assailant was in fact Dufort." <u>Dufort v. City of New York</u>, 874 F.3d 338, 348–49 (2d Cir. 2017).

It must be noted, in <u>Dufort</u>, the victim identified "a jacket [that] was similar in color to a jacket or shirt worn by one of the assailants" at the time the crime was being committed.  Here, the "IDs" involved clothing that was not even claimed to have been allegedly worn at the time of the crime, and not even the day of the crime.  Here, the "clothing ID" involved "similar" clothing that someone saw

25

plaintiff wear nine months to several years prior to the crime. Thus, the ID in Dufort was even stronger than the ID here, and the Dufort Court still found it to be insufficient. If the Dufort ID was insufficient, surely, the subject ID is insufficient.

Here, in considering Dufort, the lower court focused solely on the fact that Dufort involved a lineup, and here, there was no lineup. What the lower court failed to consider is that the video here acted exactly as the lineup did in Dufort. For purposes of analytical reasoning, they performed the same function with respect to the ID. Here, the lower court viewed the facts in Dufort only as they applied to a line up, and not at all as they applied to an overall identification. For example, the lower court wrote, regarding Dufort, "the witness told the officers that she did not recognize the plaintiff's face, and that she could only recognize the color of his sweatshirt as similar to that of one of the assailants… The police then placed the plaintiff in a lineup in which he was the only suspect wearing a jacket resembling the clothing the witness recognized… The witness identified the plaintiff, against stressing that she recognized only his clothing."

This is not at all dissimilar to what occurred herein – the only difference is that in Dufort, the ID was made after viewing a lineup, and here, the ID was made after viewing a video. In both cases, the ID was unreliable, because in both cases, the ID was based purely on an article of clothing, without any facial recognition whatsoever. In both cases, the police made an arrest based on these unreliable IDs,

and it is irrelevant whether that ID was made after viewing a lineup, or was made after viewing a video. In both cases, the ID itself was unreliable, and the arrest was made purely based on that unreliable ID.

In Dufort, "[the witness]… told police prior to Dufort's arrest that she recognized him only by the color of the jacket worn by one of the assailants…" Here, the ID is even less reliable, as the clothing in question was not even observed being worn during the commission of the crime. When there is "considerable doubt about the exact nature of [an] initial identification…at the summary judgment stage, [it] must be construed in [the criminal defendant's (the plaintiff herein)] favor. See, e.g., Beyer v. Cty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008)." Dufort continued, the witness "admitted" she could not "identify Dufort" by "face", but rather, only by "clothing." The court found this insufficient – and that involved clothing worn during the actual commission of the crime.

The Dufort Court further noted that "none of the five eyewitnesses other than Park who were questioned were able to identify Dufort…" Here, there are no eyewitnesses. Likewise, Dufort further noted, "no forensic evidence tying Dufort to the attack was ever produced…" Here, too, there is no forensic evidence.

The Dufort Court continued, "Viewing the evidence in the light most favorable to the plaintiff, a reasonable jury could find that the police arrested Dufort based on little more than a witness's statement that he wore a similar shirt to

27

that of [the] attackers." This is spot on and in exact alignment with the facts herein regarding the alleged ID of Heredia by Jiminez. Dufort found such an ID insufficient to rise to the level of probable cause, and deemed summary judgment was not warranted.

The Dufort Court continued, "Although a jury could also interpret the evidence differently, the record presents genuine issues of material fact that preclude the conclusion that there was probable cause as a matter of law and that, instead, require a trial on the merits." This reasoning should have applied herein, and the lower court erred in failing to do so.

The lower court here continues to attempt to reason, that because "the surveillance footage here showed only one person at the scene and there are no facts in evidence that suggest that other employees dressed similarly", that somehow, these flimsy facts equate to probable cause. This is such a stretch that if is accepted, it could have catastrophic consequences. Having worn a type of clothing at least nine months prior to the commission of a crime does not equate to probable cause.

Despite the reasoning being flawed, and irrelevant, it should be mentioned that the lower court's statement that "there are no facts in evidence that suggest that other employees dressed similarly" is also contradicted by the facts. "Another former employee from the gallery was a Juan Molina. Molina's name was provided

28

to Donegan along with plaintiff's and others. Molina also wore a similar black jacket and whose physical stature was similar to plaintiff's. Moreover, Molina left the gallery in September of 2016, which is the date Donegan mistakenly assigned to plaintiff as his departure date." A30, 288. Donegan failed to investigate Molina whatsoever, and the lower court ignored this fact as well.

The court's statement that "even if the Court were to accept plaintiff's argument that Jiminez's identification could not support probable cause to arrest him, the undisputed record contains two other identifications from David Parker and Jon Acosta" (A218) is factually wrong. Neither Parker nor Acosta provided positive identifications. See Donegan EBT testimony, DD5s, and Parker trial testimony, as set forth above.

With respect to an officer's "requirement" to "evaluate the credibility of a witness' ability to identify a suspect's "features", the lower court cites to *Krause v. Bennett, 887 F.2d 362*. The facts of <u>Krause</u>, however, are not on point. The lower court cites to <u>Krause,</u> specifically, "Once officers possess facts sufficient to establish probable cause, they are neither required nor allowed to sit as prosecutor, judge or jury." While this may be true, in <u>Krause</u>, the officers did in fact have facts sufficient to establish probable cause. Here, they did not. Moreover, <u>Krause</u> had absolutely nothing to do with a question about an unreliable identification used as the basis for an arrest. This case does not apply to the facts herein.

The lower court then cites to *Celestin v. City of New York, 581 F. Supp. 2d 420,* stating, "it is well established that just one positive identification may establish probable cause to arrest." What <u>Celestin</u> actually says on this topic is this: "A positive photo identification by an eyewitness is normally sufficient to establish probable cause to arrest. *See Bail v. Ramirez,* No. 04 Civ. 5084(WHP), 2007 WL 959045, at *8 (S.D.N.Y. Mar.29, 2007). *See also Miloslavsky v. AES Engineering Soc., Inc.,* 808 F.Supp. 351, 355 (S.D.N.Y.1992), *aff'd,* 993 F.2d 1534 (2d Cir.1993) ('[I]t is well-established that a law enforcement official has probable cause to arrest if he received his information from some person, ***normally the putative victim or eyewitness***, who it seems reasonable to believe is telling the truth')." <u>Celestin v. City of New York</u>, 581 F. Supp. 2d 420, 431 (E.D.N.Y. 2008).

Here, Jiminez was neither the victim, nor an eyewitness to the burglary. Jiminez was merely a co-worker of the plaintiff, who had not seen plaintiff for at least nine months, who did not witness the burglary, who did not witness what plaintiff was wearing on the date of the alleged crime, and who did not even "identify" any of plaintiff's facial features from a video that did not even depict facial features. Jiminez only made a correlation between the clothes worn by the figure in the video and clothes he had seen plaintiff wear at least nine months to several years earlier – clothes with no distinctive features whatsoever. This type of "ID" cannot stand on its own to establish probable cause. Imagine the flood gates

that would be opened, if this type of unreliable, questionable ID, based on a poor quality video that does not even show the individual's face, that does not show any particular clothing that stands out, that does not show height, weight, hair, gender, ethnicity -  were to be accepted as sufficient to establish probable cause. Anyone could point a finger at anyone, based on little to nothing.

### C.    Donegan's inadequate investigation

The lower court then states that plaintiff's argument that Detective Donegan conducted an inadequate investigation is "unpersuasive", stating that "even if true, that fact does not operate to call into question probable cause. Indeed, '[i]t is [] of no consequences' to the probable cause determination 'that a more thorough or more probing investigation might have cast doubt upon' the situation" [citations omitted].

With that statement, the court is assuming that reliable probable cause existed.  It did not.  No one could look at that video and make a credible, reliable identification.  With such a flimsy ID, based on a video that does not depict a face, and clothing that was not observed on the plaintiff the night of the crime, it was incumbent upon the defendants to pursue other avenues of further investigation prior to relying on it and making an arrest.  They did not.

Donegan's inadequate investigation is discussed more fully at A282, para. 7.

Nothing herein can negate the lack of probable cause, based on the lack of credibility with respect to Jiminez's "ID".

### D.    Malicious prosecution

The lower court correctly notes the elements of malicious prosecution, which are, 1), the initiation of a criminal proceeding; 2) termination of the proceeding in favor of the defendant (herein, the plaintiff); 3) lack of probable cause for commencing the proceeding, and 4) actual malice.  The lower court then notes that there is no dispute that a criminal proceeding was commenced against the plaintiff, and that the proceeding was terminated in plaintiff's favor.

The lower court continues, "defendants argue, however, that they did not initiate the criminal proceedings… and that there was probable cause…"  The lower court agreed, arguing that "first", "plaintiff must show that defendants played an active role in the prosecution, such as giving advice and encouragement or insisting the authorities act", and that here, defendants only "participated in his arrest."  This is not true.  Defendants actively engaged with the prosecution, by providing a sworn affidavit that contained material errors. RA201-206; see also "Material misrepresentations to the DA" section, above.

The lower court continued, "second", that "defendants had ample probable cause to arrest plaintiff, as discussed above."  Here, as discussed above, it is submitted, they did not.  The lower court then states, "the fact that the grand jury

32

returned an indictment against plaintiff creates a presumption that his indictment was procured with probable cause". Here, however, while the grand jury proceedings are secret, it can be assumed that the same false information that was provided to the DA was provided to the grand jury. For example, the grand jury may have been told there were three IDs, when there was only one questionable, highly suspect ID. The grand jury may have been misinformed that plaintiff left the gallery in September, when he really left in April. The grand jury may not have been told about Molina, who had a similar body type and build as plaintiff; Molina also had a black jacket similar to the figure's in the video. A30.

The grand jury may not have even been shown the video, and if they weren't, they may have reached a different determination if they had been shown the video.

A grand jury indictment is not a "presumption" of probable cause if the grand jury indictment is based on misinformation. Donegan misrepresented facts to the DA, so likely, there were misrepresentations of fact presented to the grand jury. Such an indictment cannot be considered a basis for a presumption of probable cause.

Moreover, Dufort noted that "they key questions of material fact regarding Dufort's malicious prosecution claims remain in dispute." The same is true, here.

Donegan clearly participated in the initiation of the criminal proceeding, and provided false information with respect to same. Malice can certainly be implied here based on the numerous intentional false statements made to the DA's office by Donegan. Not only did Donegan relay false and misleading information that was detrimental and harmful to the plaintiff, he swore to it and certified it, claiming later, that he "didn't notice" the mistakes. A201-206, 314.

In order to set forth elements of malice, a plaintiff must show that the arresting officer "brought formal charges and had the person arraigned, or filled out complaining and corroborating affidavits, or swore to and signed a felony complaint." Here, Donegan did all of those things. RA201-206. See *Mitchell v. City of NY, 841 F.3d 72.*

Further arguments and more extensive case law regarding malicious prosecution claim, and why it should not have been dismissed on summary judgment, can be found at A291-293.

### E.    Qualified Immunity

The lower court did not address qualified immunity, but the issue was briefed.

It is plaintiff's position that qualified immunity does not and should not attach herein. See A294-295 with respect to plaintiff's arguments regarding same.

## F.     Cozart

52.     The lower court did not address Detective Cozart's acts as being distinguishable from Detective Donegan's acts.  This issue, too, was briefed.

It is plaintiff's position that although Donegan was much more involved in the false arrets and malicious prosecution of the plaintiff, Cozart is not free from liability, as he, too, had no independent probable cause to arrest the plaintiff. He relied upon the unreliable and untrustworthy ID relayed to him by Donegan, without inquiring or verifying any facts himself. See A295.

## XI.   Conclusion

Based on the unreliable and untrustworthy images depicted in the NYU video, which were the sole basis for the alleged "ID" that Donegan improperly relied on, and the "similar clothing" statement which did not relate to clothing worn on the date of incident, but rather, clothing observed at some random unidentified time in the past occurring no earlier than nine months prior, such an "ID" which no reasonable officer would have reasonably relied on, *inter alia,* the claims of false arrest and malicious prosecution should proceed to a jury, and summary judgment should have been denied, and a reversal of the lower court decision is warranted.

Dated: August 15, 2024
     Great Neck, New York

       /s/   Joseph W. Murray_____
JOSEPH W. MURRAY, ESQ.
185 Great Neck Road, Suite 461
Great Neck, New York 11021
646-838-1702

*and*

LAW OFFICES OF
   NORA CONSTANCE MARINO
175 East Shore Road, Suite 230
Great Neck, New York 11023
516-829-8399

*Attorneys for Plaintiff-Appellant*

36

## <u>CERTIFICATE OF COMPLIANCE WITH FRAP 32(A)</u>

1.      This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B) because this brief contains 7,965 words, excluding the parts of

the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because

this brief has been prepared in a proportionally spaced typeface using

Microsoft Word in Times New Roman, 14 point font.


Dated:   August 15, 2024
          Great Neck, New York

                                   Respectfully submitted,

                                    /s/   Joseph W. Murray_____
                                   JOSEPH W. MURRAY, ESQ.
                                   185 Great Neck Road, Suite 461
                                   Great Neck, New York 11021
                                   646-838-1702

                                   *and*

                                   LAW OFFICES OF
                                     NORA CONSTANCE MARINO
                                   175 East Shore Road, Suite 230
                                   Great Neck, New York 11023
                                   516-829-8399

                                   *Attorneys for Plaintiff-Appellant*

SPECIAL APPENDIX

**Table of Contents**

**Page**

Judgment of the United States District Court
    for the Eastern District of New York, entered March 30, 2024  ..    SPA1

**SPA1**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
DIEGO HEREDIA,

                Plaintiff,                      JUDGMENT
                                                  19-CV-5227(LDH)

        V.

CITY OF NEW YORK, NEW YORK CITY
POLICE DEPARTMENT, DETECTIVE
THOMAS DONEGAN, DETECTIVE
THOMAS COZART, AND P.O. JOHN DOES
Nos. 1-20,

                Defendants.
------------------------------------------------------------ X

        A Memorandum and Order of Honorable LaShann DeArcy Hall, United States District

Judge, having been filed on March 29, 2024, granting Defendants' motion for summary

judgment; it is

        ORDERED and ADJUDGED that Judgment is entered in favor of Defendant and against

Plaintiff; and this case is closed.

Dated: Brooklyn, NY                       s/*Brenna B. Mahoney*
        March 30, 2024                  Brenna B. Mahoney
                                        Clerk of Court